**REMINGTON RAND, Inc., v. ART METAL CONST. CO.**

**No. 2.**

Circuit Court of Appeals, Second Circuit.

Nov. 3, 1930.

Charles Neave, of New York City (Charles W. Parker, of Buffalo, N. Y., of counsel), for appellant.

Barton A. Bean, Jr., and Albert R. Henry, both of Buffalo, N. Y.; for appellee.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

MANTON, Circuit Judge.

The patents sued on relate to fire-resisting safes or cabinets which are used for preserving documents, papers, or office records. They are constructed as a metallic cabinet formed with spaced inner and outer sheet metal walls, between which is placed a material of low heat conductivity which, in the event of fire, would retard the passage of heat and flames into the cabinet. Iron safes are old in the art, and, in construction, provided heavy iron walls inclosing either an additional metal or heat-insulating material or both. In constructing such safes, the manufacturer had principally in mind making them both fireproof and burglary proof. The safes here considered have metallic walls, much thinner, and apparently no particular attempt has been made to provide a structure which would resist burglary by the use of burglar's tools. In this sense, they are not constructed for the safe-keeping of money. These cabinets or safes were improved structurally from time to time by providing improved walls, dry construction, and adjustable interiors so that such cabinets became better adapted to receive various types of papers or records. The inventors of the patents here in suit intended to avoid the heavy weight, yet provide durable permanent heat-resisting structures.

Patent No. 1,350,363 was granted August 24, 1920, on an application filed March 28, 1917. No. 15,529, a reissue of No. 1,342,204 dated June 1, 1920, was granted January 16, 1923. At the time these patents were granted, the trade realized that qualities of linings for safes required the best nonconducting and noncombustible material known; that it should hold water in some form which, when it is subjected to a heat test, will pass off gradually in the form of vapor or steam to carry off heat, not only from the interior of the safe, but reduce the temperature of the metal casing and protect it from burning and melting. There was a recognition by the trade also that acid vapors should not be liberated with those of water and cause corrosive damage not only to the metallic part of the safe, but to the interior contents placed there for preservation; that the lining should not rust the iron or metal inclosure with which it came in contact; that it should not give off moisture and thereby cause dampness within the safe or vault, causing books or other valuables to mildew or mold; that it should not shrink or expand, which would

cause strains or stresses and impair the firmness and solidity of the structure.

Both patents sued on provide for the construction of improved linings. In No. 1,350,-363, the inventive thought is directed to the provision of the lining in which should be embodied the cardinal principles of strength, lightness, and weight, economy, and efficient resistance to the entrance of heat under fire conditions. While a concrete or cement had been used in prior art safes, such were disclaimed because of bulkiness and low heat-insulating value, as well as its disintegrating qualities when exposed to high temperatures. The patentees provide in this patent two linings, one within the other, and respectively disposed adjacent the inner and outer walls of the safe. The outer lining specified was dry, having material of low specific gravity and heat conductivity so that it would not cause rust, and was intended to protect the inner lining from premature breakdown. The specification of the inner lining, referred to as relatively wet, is that it is like the outer lining, except the material for the inner lining serves as a matrix for discrete lumps of some stable salt, which contains a high content of water of crystallization, which is a permanent ever-ready heat absorber and steam producer. Thus, the patentee provides for a combination patent, and, to satisfy the combination, there must be included two walls, both durable, permanent, dry to the touch, and nondisintegrating under fire conditions, but with an inner wall containing lumps of water-bearing salt which, under fire conditions, is slowly broken up to absorb heat and inject steam into the interior of the safe.

The claims provide (a) a fire heat resisting document preserving cabinet constructed with inner and outer sheet metal walls (b) having an inner wetting insulation disposed outside said inner sheet metal wall, (c) comprising a porous material carrying a stable salt containing water of crystallization, and (d) a relatively dry insulation disposed between said outer sheet metal wall and said wetting insulation and operative to protect said wetting insulation against premature or excessive vaporization.

The prior art disclosed the idea of utilizing the chemically combined water as a fire-resistant medium in insulations used for linings for safes. In the Hyatt patent, No. 100,632, granted March 8, 1870, the patent, especially the fifth example, refers to combining one part of ground or crushed asbestos with one equal part of any salt or salts in small crystals containing water of crystallization, mixing them well together, and with this compound filling closely the chambers or spaces between the inner and outer walls of the safe. And the Butler patent, No. 152,-598, granted June 30, 1874, points out the need for nonconducting and incombustible material in safe linings, providing that it shall hold water in some form which, when it is subjected to high heat, will pass off gradually in the form of vapor or steam to carry off heat not only from the interior of the safe, but to reduce the temperature of the outer iron casing and protect it from burning and melting. He also points out the need to prevent rusting the iron inclosure with which it is in contact and that it shall not give off moisture and dampness within the safe or vault causing books or other valuables to mold or mildew. Hill in his patent No. 1,010,259 also describes the utilization of water of crystallization in heat-insulating linings. Sherwood, in his patent No. 11,842, granted back in October, 1854, discloses an insulation composition composed of clay and alum; the latter containing chemically combined moisture which, when heated, gave out that moisture. The purpose of the composite insulation is specified in his claims.

In view of this state of the art, there was nothing new in providing a double layer of insulation, each layer having different characteristics, the inner layer having in it materials containing chemically combined moisture and the outer layer being a dry layer. In each of the patents referred to, there was a clear recognition and description of a safe lining having heat-resisting properties and holding water of crystallization to be given off under heat of fire. This, in short, is what the appellee does claim for this patent in suit. We hold that it is insufficient, in view of the prior art, and it does not rise to the dignity of invention to construct such lining as this patent teaches.

The invention of the reissue patent sued on is claimed to reside in the provisions of a safe lining, monolithic in character, which is precast, then predried to a point affecting the removal of the corrosive free water, but not stable or noncorrosive water, which lining is subsequently assembled between the safe walls. Claims 1, 9, and 22 are sued on. Claim 1 calls for a fire-resistant cabinet comprising an inner integral body including fixed walls of the set composition containing chemically bound water or moisture, which is monolithically cast; also for outer shell or wall of sheet metal inclosing said body and

independent thereof, and the body is practically devoid, through artificial elimination, of free water. Claim 9 is for the cast monolith made of gypsum, sawdust, and water, wherein the free water contained therein has been artificially expelled, leaving only the chemically bound water. Claim 22 is a method claim, and provides (a) for making a fluid mixture, (b) preparing a suitable mold having reinforcing material therein, (c) pouring the mixture into the mold so that the reinforcing material will be incorporated in the cast, and (d) subjecting the mold to drying process to eliminate the free water and still not sufficient to release the chemically bound water. One of the difficulties of the art, as encountered, was the inability to have a lining that would be noncorrosive and that would last for years as a permanent lining and still contain water. The so-called poured types of linings were known in the art. In these, insulating material such as plaster of paris is mixed to form a fluid mass and poured in the space between the safe walls and then allowed to set as plaster normally does. Such linings were, when new, of good fire-resistant qualities, for they contained the necessary water. This water was of two kinds, (a) that which reacted as a chemical with the plaster to be taken up thereby to form the hardened form, and (b) the remaining water which was necessary to form the fluid mixture, was not taken up in the reaction, but was left in a free state between the safe walls. But the difficulty with these poured linings was that the excess water acted against the metal and had a corrosive effect, rusting the safe walls. It also affected the contents of the safe. Some of these poured types are illustrated by Fitzgerald (1843). Butler, in his patent heretofore referred to, made provisions for means to solve the problem by adding to the fluid and poured mixture some calcium chloride which he claimed would hold the water and prevent rusting. The prior patented art made recognition of the disadvantages of water included in the poured types of safe linings. Efforts were made to take care of excess water, but the results did not produce a lining when poured which was suitable, permanent, and noncorrosive. These patentees did not pour into the safe walls, but did pour the insulation material into a detachable mold, and, after the plaster was set, they took the mold away to expose the walls of the casting and dry the lining to a point which affected the removal of deleterious free water, but which did not affect the chemically bound water in the plaster itself. This precast and

predried structure, a durable and permanent monolith, was then placed between the safe walls, and provided what the trade has come to learn to be a reliable and noncorrosive lining. Nothing in the prior art suggested either this structure or the method of manufacturing. This accomplishment has filled a need of the art, and results from inventive thought.

The appellant has substantially copied the appellee's monolith lining and method of construction. It seeks, however, to escape the charge of infringement, claiming that its lining does contain free water. Its advertising refers to its "mono-dry" lining, dry as chalk to the touch. It refers to its lining as "one that will not give off moisture in any normal temperature." Its moisture is chemically combined—crystallized and permanently held." Moreover, it appears that the appellant began to infringe the appellee's methods under the supervision of one of the appellee's inventors and advertised its lining as precast monolith, dry as chalk to the touch, containing only chemically bound water. From this copying of appellee's methods, the claim of infringement clearly appears. Appellee argues that it does not cast the monolith independently of the walls of the safe. The argument is that it, in the molding practice, places the mold members on a dry frame and seals the cast directly to the dry frame in the mold. But this appears to be the practice that has been used in the commercial manufacturing of these safes. The practice embodying a metallic member in the edge of the cast to provide a hinge for the safe door was generally followed, and is indicated in the text of the patent, which says: "The outer casting of metal may be omitted  *  *  * in which case the hinges to support the doors are embedded in the casting in a way well understood in the art." It thus appears that it was the intention of the patentees to forego the positioning of the door-jamb in the casting itself. Claim 1 of the patent says that the casting is independent of the outer shell of sheet metal which in practice is composed of the top, bottom, and side walls. These are the outer walls or shells of appellant's structure and the shell which is placed over the casting formed independently thereof. Appellant may not avoid infringement of the claim by placing a small bit of metal on any part of the casting surface; appellant casts independently of the outer walls to make a precast structure. These walls are removed to facilitate drying, and it is clear that in its practice it achieves the results of the patent, and, moreover, that practice is

covered by the claim. Nowhere in the patent is it specified that all the plaster must be kept completely uncovered during the drying, and the door-jamb is not simply a mold; it is a part of the monolith, just as is the reinforcing wire embedded therein. Adopting the appellee's invention, the inclusion of a superficial part does not avoid infringement when the adopted parts serve their intended functions without modification. Nor will infringement be escaped on the theory that the hygroscopic moisture, or moisture from the atmosphere, which gets onto the casts, makes those casts noninfringing. It is abundantly established that the appellant's lining is dry, contains no free water, and that its hygroscopic moisture value is too infinitesimal to escape infringement. General Electric Co. v. Alexander (C. C. A.) 280 F. 852; Van Kannel Revolving Door Co. v. Straus (C. C. A.) 235 F. 135; Murray v. Detroit Wire Spring Co. (C. C. A.) 206 F. 465; Morrison v. Sonn (C. C.) 111 F. 172.

The argument that the reissue patent is invalid because of alleged inoperativeness is without merit. Appellant is not in a position to deny the utility of the monolithic lining which it constructs according to appellee's process and in infringement of its patent. The contention that the patent purports to be for a safe lining containing no free water and that all linings contain some free water is attempted to be supported on the plea that some atmospheric moisture which can be determined only by carefully conducted scientific tests constitutes free water referred to in the patent. But the teaching of the patent is not to eliminate the atmospheric moisture, but to keep it in, and the appellant's attack on the validity of the patent is based upon an erroneous understanding of free water. Nor is the appellee estopped in its claims by reason of the contents of the file wrappers. The reissue sought to obtain the claims to the lining per se and its method of manufacture; claims which had not been inserted in the original. There was no controversy regarding what was meant by free water, and the term seems to have been understood by the Patent Office.

Claim 3, referred to by the appellant as requiring the lining freed from all rust-preventing water, refers merely to drying to a determined point, which might mean the extraction of only part of the water and not all. The claims which were sought in the reissue proceedings recite the elimination of practically all the free water, but not the bound water, and these claims were allowed. The appellee has not attempted to broaden its patent claims, and is not estopped by the file wrapper's contents. Baltzley v. Spengler Loomis Mfg. Co., 262 F. 423 (C. C. A. 2); Consolidated Fastener Co. v. Columbian Fastener Co., 79 F. 795 (C. C. N. D. N. Y.).

The decree will be modified by holding the reissue patent No. 15,529 valid and infringed and patent No. 1,350,363 invalid.

Decree modified.