## UTAH RADIO PRODUCTS CO. v. DELCO APPLIANCE CORPORATION.
### No. 2040.

District Court, W. D. New York.

June 27, 1938.

John S. Powers, of Buffalo, N. Y. (Parker, Carlson, Pitzner & Hubbard, C. Paul Parker, Lincoln B. Smith, and Richard Russell Wolfe, all of Chicago, Ill., of counsel), for plaintiff.

Cooper, Kerr & Dunham, of New York City, and Falk, Phillips, Twelvetrees & Falk and Frederic R. Twelvetrees, all of Buffalo, N. Y. (Drury W. Cooper and C. Blake Townsend, both of New York City, of counsel), for defendant.

KNIGHT, District Judge.

This is a suit for infringement of the patent to Edward L. Barrett No. 1,924,082, issued to plaintiff as assignee on August 28, 1933, on application filed January 3, 1933, claimed to cover a vibrator used in a "B" battery eliminator for radio receiving sets. Title is admitted. The manufacture and sale of certain of the accused devices are also admitted. The issues raised are validity and' infringement of the patent and whether punitive damages should be awarded.

Plaintiff is a manufacturer of radio apparatus and supplies, including vibrators claimed to be made in accordance with the patent in suit. The defendant is a subsidiary of General Motors Company, and manufactures and sells, among other items, "B"

eliminator vibrators for use in automobile radio receivers.

Automobile radio receiving sets require that electrical current be supplied to them at two different voltages. These two supplies of current are commonly referred to as "A" and "B" supplies. The "A" supply is a low voltage current, and for this purpose a low voltage source may be either alternating or direct current. For the "B" supply however a source of comparatively high voltage direct current of between 180 and 250 volts must be had.

In an automobile as well as in a house radio set where only battery current is available, the user of a radio set, before the introduction of the so-called vibrator, was compelled to buy separate batteries for the two separate voltages. Until recent years several methods were used to supply the second voltage. One method was the use of a separate set of batteries. Objections to this method are obvious. The batteries were expensive and required frequent renewal. They were bulky and heavy, and were impractical for use in the limited space available for installation in automobiles. Another form of supply unit was the motor generator, in which current from the car battery was used to operate a small motor to operate a rotating electric motor. It, likewise, was expensive to construct, bulky and heavy. It was inefficient and imposed a heavy drain on the storage battery. There was also the so-called dynamotor which operated on principles similar to those of the motor generator, and was subject to the same objections.

The storage battery of the car, the source of the current for a car radio set, is a conventional six volt battery. This voltage varies, having approximate range from 3 to 9 volts. The effect of this variation of the voltage is shown in the use of a vibrator in a buzzer, one particularly referred to herein being known as the Edward buzzer. Where there is a decrease in the battery voltage from 30 to 40 per cent., the pull of the magnet may be insufficient to open the contacts. This results in burning these contacts. Where the voltage is beyond its normal value, an abnormally strong pulling force is evidenced on the armature, and this causes irregular movement and chattering, and also burns the surface of the contacts. Road shock and general unevenness of travel by motor, likewise, destroy uniform effectiveness of a vibrator such as the Edward buzzer.

A "B" battery eliminator, as a whole, includes as major elements, a transformer, a rectifier and vibrator. The Barrett patent in suit is claimed to cover only the vibrator. The function of the transformer is to change the low voltage direct current supplied by the low voltage storage battery to a high voltage alternating current. The function of the vibrator is to break up the steady direct current from the car storage battery into a rapid succession of impulses of current in the primary winding of the transformer. The high potential alternating current is changed to direct current of similar potentiality by the rectifier. It is claimed that the combination of the elements shown in the Barrett patent makes possible a smooth, rhythmic circuit interruption despite abnormally high or low voltage, despite any changes in position and consequent variation in gravital effect, and despite vehicle vibration. The general combination of major elements which were included in the vibrator in the patent in suit and by which these results are obtained are the so-called reed (an elongated, thin, flat, metallic, flexible, resilient element); a side contact mounting; a magnet in such a position that the armature on the end of the reed swings past the pole piece of the magnet in close proximity but not in contact therewith.

The patent in suit is entitled "Motor Actuated Circuit-Controlling Means." The patent states that the invention relates generally to a circuit controlling means and has particular reference to means of a nature which is suited for use in connection with a direct current transformer system "intended to replace the 'B' battery which customarily supplies direct current to one circuit of a radio receiving set." Below are shown the patent drawings, Figure 1 illustrating the vibrator, Figure 2 illustrating the circuit in which the vibrator is used. Figure 1 shows a magnet with active pole faces 39. A vibrating reed 29, like the side contacts 27 and 28, is described as an elongated flat resilient member rigidly secured to the base. The reed is "arranged for swinging movement to close a circuit either through the contact 27 or contact 28." It shows spacing fingers 44, having their ends bent outwardly to serve as spacers and limiting abutments between the contacts 27 and 28. They are rigidly secured together by spacers 42 and 43. A vibrating reed 29, normally straight and untensioned, is supported substantially intermediate the contacts 27

and 28, such reed extending beyond the contacts 27 and 28 to a point substantially adjacent to the plane of the pole pieces 39 and carrying an armature 51 in an off-center position in relation to the pole faces and having a clearance therefrom as described in the specifications preferably from .005 to .010 of an inch.

to the two pole fixtures. This closes the circuit through contacts 28 and 29 causing a surge of current in one section of the primary winding 11 through a circuit from the battery comprising lead 22, center tap 13, primary winding 11, lead 26, contact 28, contact 29, and leads 30 and 31. Closing this contact shunts out the electromagnet.

Fig. 1.

Fig. 2.

The operation of this device may be thus described in relation to Figure 2. When the switch 54 is closed, the electromagnet 34 is energized through a circuit from a battery 24 through lead 22, center tap 13, one side of the primary winding 11, wire 26, lead 53, electromagnet winding 36, leads 52 and 31 to the battery. The electromagnet, thus energized, tends to draw the armature 51 from its eccentric position to a central position with respect

Upon the de-energization of the magnet, the resilience of the reed reverses the swing of the reed and contact is established between the reed or contact 29 and contact 27 to establish a different circuit through contacts 29 and 27, wire 25, the other section of the primary winding 11, center tap 13, lead 22, battery 24 and leads 31 and 30. Meanwhile the electromagnet has again become energized through breaking of the circuits through contacts

28 and 29 and again exercises a pull on the armature to swing the reed to contact 28 and the cycle is repeated with exceeding rapidity, alternately energizing the sections of the primary winding and producing a corresponding current in the secondary winding, which, after it passes through the rectifier, is conveyed to the filter system as direct current of high potential. The disclosures of the Barrett patent satisfy the statutory requirements as to sufficiency of description. There is no question as to the operability of this vibrator. There is no question as to the practical value of the Barrett device or its utility.

The evidence discloses that a large number of the Barrett vibrators have been sold by the plaintiff company. These have been sold in separate units and as parts of complete "B" eliminator apparatus. These sales began on or about August 5, 1932. Since that date the physical design of the vibrator has been changed and certain improvements have been made, but the essential characteristics have been retained. The industry has increased very rapidly from the year 1932 to the present time. A large increase in sales of radio sets for automobiles has resulted from the use of a "B" battery eliminator in connection with automobile radios. There is not any automobile radio used today which does not have such an eliminator.

■ The first action on the Barrett application was taken by the Patent Office on April 8, 1933. Subsequent amendments were shortly thereafter acted upon, and the application was finally allowed July 20, 1933. Prior to the latter date the Barrett vibrators had been marked with the notice "Patent Pending." Trico Products Corp. v. Apco-Mossberg Corp., 1 Cir., 45 F.2d 594. The fact that others skilled in the art may not have devised its equivalent is evidence of patentability. If this patent is valid, it is a pioneer in the field of radio. Westinghouse v. Boyden Power Brake Co., 170 U.S. 537, 18 S.Ct. 707, 42 L.Ed. 1136. It is claimed that the defendant's vibrators clearly embody the combination of the patent in suit. Three forms of defendant's vibrators shown below are the three forms of vibrators charged to be copies of three corresponding forms of vibrators marketed by the plaintiff.

These drawings are taken from plaintiff's brief and are used in preference to the exhibits from which they are taken for reasons of simplicity and clarity:

## EXHIBIT B

## EXHIBIT-C

## EXHIBIT-YY

In the record the defendant's vibrators are referred to as plaintiff's Exhibits A, B, and C. As to Exhibit A, the proofs show that none of these have been made or sold. Manufacture, sale and use of vibrators substantially identical with Exhibits B and C, after the issuance of the patent in suit and prior to the filing of the Bill of Complaint, are admitted. In addition we also have another exhibit, defendant's Exhibit YY, admitted to have been made by the defendant. Let us examine these structures, Exhibits "B," "C" and "YY", in comparison with the plaintiff's patent.

■ The three elements of the basic combination of the Barrett patent are found in plaintiff's Exhibit B. This shows an elongated, flat, resilient vibrator reed. It is sufficiently strong to support the armature without distortion by gravity or road shock.

It has sufficient resiliency and hardness to give a natural mechanical vibration of relatively high frequency, to contribute to the rebound movement in the course of its vibration and to insure full movement on return stroke. It has a resilient end portion extending a substantial distance beyond the side contacts, thus allowing continued movement at the free end of the reed after one of the side contacts has been engaged. This exhibit shows a side contact arrangement substantially identical with the Barrett patent, Figure 1. It has a set of double contact points 50–D carried by the reed 29–D. They are disposed in normally open relation with respect to co-operating contacts 48-D and 49-D on opposite sides of the reed. These side contact points are carried by resilient and flexible support arms, 27–D and 28–D, with the outer ends of these secured at one end of the frame, 32–D. The spacing between the side contacts 48–D and 49–D, with respect to the reed contact, is adjusted by means of fixed fingers, 44–D. The relationship of these parts is described in defendant's patent application No. 699,522, and there shown to be comparable with the relationship of corresponding parts of plaintiff's patent. Exhibit B bears a second set of cooperating contact points. Functionally this secondary set serves a different purpose in that they rectify the alternating current output of the associated transformer and do not affect the remainder of the vibrator structure. Infringement is not avoided by the mere addition of parts to a patented structure, Walker on Patents, 6th Ed., 1929, sec. 409; Remington Rand, Inc., v. Art Metal Construction Co., 2 Cir., 45 F.2d 136; nor by a duplication of parts.

The magnet armature arrangement of the Barrett patent is found in defendant's vibrator, Exhibit B. The vibratory reed 29–D carries an armature 51–D positioned with respect to the electromagnet 34–D so that the armature swings past the pole piece of the magnet in close proximity thereto but never in engagement. The structure of the electromagnet 34–D is substantially identical with the patent, except that the core of the magnet and the associated winding have been shifted so that it extends longitudinally of the casing instead of transversely to it. The pole pieces 39–D lie in a plane parallel with the end of the armature. The result is the same as in the Barrett device in that the active faces of the electromagnet pole pieces are arranged

transversely of the vibrator structure, and entirely outside of the path of the armature. Defendant's description in its patent application 699,522 exactly supports this conclusion. The term "off center position" or "eccentric position" of the armature has particular significance. It is described in the patent specification page 2, lines 95, et seq. and claim 1. The armature 51 is threaded by flux of the magnetic field from the active faces of the pole pieces 39. The major portion of the armature is located below the center line of the electromagnet when the armature is in its idle position. Hence the armature is pulled toward the axis of symmetry in a direction generally parallel to the magnetic pole pieces. By this arrangement the armature is moved in the magnetic field without ever striking any part of the magnet itself. The means employed in defendant's vibrator for this purpose is similar although the direction of movement of the armature is perpendicular to the plane of the pole pieces of the magnet. By way of contrast the 1852 Ruhmkorff device illustrates what is termed the hammer type armature. The armature moves directly toward the magnet with a hammer-like action in response to the magnetic attraction.

Casing 32–D is in the form of a U-shaped piece of metal. The frame of the patented device, as now manufactured by plaintiff, is shown in the form of a section casing made up of a flat base and a removable cup-shaped cover. However, the casing 32-D of defendant's Exhibit B performs the same function as the casing 32 shown in the patent. This difference is not consequential. Bates v. Coe, 98 U.S. 31, 25 L.Ed. 68. It was stipulated that defendant's vibrator, plaintiff's Exhibit B, was made and sold for use in a circuit such as shown in figure 4 of defendant's application Serial No. 691,786. Tracing this circuit, it will be seen that it is identical with that of the Barrett patent.

The utilization of the main circuit-interrupting contacts to control the vibrator actuating electromagnet results in the application of the so-called double voltage to the electromagnet while the vibrator is running under normal conditions. If a six volt battery is used, twice that voltage will be automatically applied to the electromagnet when the vibrator is running and connected in the circuit as shown in figure 2 of the patent. This preferred contact and electromagnet arrangement has been em-

bodied in the vibrators sold by the defendant. The advantages of this circuit arrangement are plain. First, the number of contacts required is minimized. Second, continued operation is insured even though the battery voltage decreases during the interim. It is claimed by the defendant that this operation is a defect in the system, but nevertheless the defendant has adopted it. The infringer will not be heard to deny the invention appropriated. Remington Cash Register Co., Inc., et al. v. National Cash Register Co., D.C., 6 F.2d 585; Diamond Rubber Co. v. Consolidated Rubber Tire Co. et al., 220 U.S. 428, 31 S.Ct. 444, 55 L.Ed. 527. This double voltage feature, however, is only a preferred feature of the vibrator patent. While it is claimed that all of the claims in the Barrett patent are infringed by defendant's vibrator, plaintiff's Exhibit B, plaintiff submits that it is sufficient, however, to specifically apply only Claims 1, 3, 7, 8, 9 and 11 to the structure as representative claims. First making the comparison of the plaintiff's Exhibit B, both Claim 1 of the patent and Exhibit B have an elongated casing, an electromagnet mounted in one end and having pole faces located in a plane transverse of the casing and facing toward the other end thereof; three spaced contacts mounted in the end of said casing and extending toward the electromagnet; an armature carried by the end of the center contact arranged to be moved by the electromagnet to effect the circuit closing operation set forth in the patent; and spacing fingers interposed between the outer contacts to adjust the position of these side contacts with respect to the center contacts.

Claim 3 of the patent and the plaintiff's Exhibit B show spaced contacts controlling separate circuits in the system; intermediate and common contacts for completing each circuit; means for reciprocating the common contact between the spaced contacts; all of the contacts made of resilient material; adjustment fingers underlying each of the spaced contacts and means maintaining spaced relationship between the fingers. In like manner each of the other claims of the patent reads upon the device manufactured by defendant and now before the court as plaintiff's Exhibit B. This device must be found to infringe the patent.

A later device made by defendant, plaintiff's Exhibit C, differs in construction from Exhibit B and is claimed to infringe claims 3, and 7 through 11. The outer contact elements are mounted near the opposite end of the casing from the center contact mounting. The outer contact elements are composed of a flat elongated resilient material but are tensioned outward against insulating adjustment points. The contact points on these elements are located distant from the mounting about ⅔ of the distance between the mounting and the adjustment point. The contact points on the insulating reed instead of being unitary are located on separate resilient supporting fingers fastened to the reed. Claim 3 of the patent, calling for spacing fingers disposed between and limiting the motion of the inwardly tensioned outer contact elements does not read directly upon this structure. It is contended by plaintiff that the change of the parts is a mere reversal of parts, since the spacing of the outer points is secured by reason of an outward tension of the contact elements against adjustment points, in contrast to the patent method of using spacing fingers to control an inward tension of the contact elements against the spacing fingers, and the resilience of the outer contacts is preserved by means of the position in which the contact point is mounted and the mounting of the contacts on the vibrating reed. No change appears in the function of the vibrator by reason of these changes in form. It would seem to be the mechanical equivalent of the plaintiff's device. It reads directly under the claims 7 through 11. Comparison with Claim 9, for example, shows that defendant's device has a magnet mounted at one end of a base, a reed mounted at the other end of the base bearing on its free end an armature supported for movement close to and substantially parallel to the active pole face of the magnet, the reed having contact means which are normally out of contact with fixed contacts located on either side of the reed but engageable with said fixed contacts upon movement of the reed to and from its position at one side of the center of magnetic attraction of the active pole face of the magnet as the result of intermittent energization of the magnet. These are all of the elements of the claim. In defendant's device, Exhibit YY, the vibrating contact and the outer contacts are mounted in a stack, but the outer contacts are tensioned outward against insulated adjustment points, the contact points on the vibrating contact being separately mounted

on resilient fingers. This device also is a mechanical equivalent of the patent structure and constitutes an infringement of the patent.

■ Defendant calls attention to the addition to the specification by post allowance amendment of certain alleged objects of the invention which plaintiff now asserts to be essential elements of the patent. The amendment reads, in part: "another object is to provide an improved circuit making and breaking device in a 'B' battery eliminator which embodies a swinging armature in control of a normally open circuit and supported within the range of magnetic force of an electromagnet and eccentrically of the center of said force for movement along but never in contact with an active pole face of the electromagnet, and an energizing winding for the electromagnet which includes a shunt circuit closed to decrease the energization of said electromagnet below an effective point when the circuit is closed." Defendant claims that the swinging armature, open circuit, eccentric arrangement of the armature and movement of the armature along but never in contact with the pole face of the magnet and the shunting of the electromagnet circuit are new objects set forth for the first time in the amendment. Although characterized as such by defendant, these details are not objects of the invention but are the means by which the objects are to be accomplished. As such they are all included in the original specifications. The object stated is "to provide an improved circuit making and breaking device in a 'B' battery eliminator." The application as filed by Barrett disclosed as an object of the invention the provision "in a novel direct circuit transforming system an improved mechanism for alternately establishing and breaking a plurality of circuits" and also disclosed that it related to systems "especially suited and adopted for use in place of the 'B' battery which customarily supplies direct current to one circuit of a radio receiving set."

■ The second objection to the amendment to the specification relates to a statement as to the effect of gravity upon the operation of the device. The specification as originally submitted stated that upon proper adjustment the device would operate satisfactorily in any position in which it might be placed, since the effect of any outside force, such as gravity, in the swinging movement of the contact would be "substantially counteracted by the fact that the thermionic rectifier balances any variation in current flow." The words quoted were subsequently stricken out and the word "negligible" substituted. Defendant alleges that the change was made to cover the device manufactured by it prior to the issue of the patent, which device was not used in connection with a thermionic rectifier. It may be noted again in this connection that the patent covers only the circuit breaking means. Although the means is designed to operate in connection with a transformer system, the construction and operation of the balance of the system cannot affect the validity of the patent covering the vibrator. The type of rectifier used in the system is not covered by the patent nor is the device restricted to operate in conjunction with only one type of rectifier. The reference to the rectifier was not a necessary part of the patent description. It described no part of the device which is essential to construction or operation. The patent would have been valid had it been omitted altogether. It is a statement of theory only. A patent is valid even though the inventor failed to understand the theory of the device or process patented.

■ The remaining objection to the amendment relates to the addition of a paragraph pointing out that the device will operate properly when used in connection with the elimination of the "B" battery commonly used in automobile radio receiving sets, despite "variations which so frequently occur in the potential of automobile batteries" "since a minimum potential will reciprocate the contact 29 operatively while a maximum potential will not cause the armature to strike the opposed pole faces." This additional statement adds nothing to the essential features of the patent device. It is a mere statement of the manner in which the device would react under certain conditions. It might have been omitted from the specifications without in the least reducing the validity or effectiveness of the patent.

■ In addition the defendant objects to the validity of Claims 9, 10 and 11, since they were added subsequent to the original application and not supported by supplemental oath. All of the elements of these claims are found in the original specifica-

tions. No invention lies in these claims which was not covered by the original application.

None of the changes or additions to which the foregoing objections were made are of a nature to require a supplemental oath on the part of the inventor. None of them disclose any additional claim going beyond the disclosures of the original application or setting up any new or other invention than that previously described and claimed. Under the circumstances no supplemental oath was necessary.

The patent in suit is not limited to automobile radio receiver use. However, its special features render it most suitable for such use. The fact that the patent did not limit the device to automobile use will not react against it when the device is found especially suited for such use. An inventor is entitled to a limited monopoly of a patented device regardless of its use, and will be protected in such use even though new uses arise which were not contemplated at the time of the creation of the device. On the other hand, the fact that the patent is not limited to a particular use may broaden the base of prior art and prior patent against which the patent must stand.

For the patent at bar plaintiff does not claim the status of a basic patent on circuit interrupters. Barrett was familiar with the various types of interrupters which had been tried and found generally unsatisfactory, including various buzzer types. The specifications indicate that Barrett sought to patent an "improved" mechanism for alternately establishing and breaking a plurality of circuits.

Many of the prior circuit making and breaking means had been found satisfactory for particular uses. Doorbells had been rung, direct current converted for operating telephone bells, alternating current converted to direct current, machines operated by relays, clocks regulated and synchronized. All of these objects had been accomplished by circuit making and breaking means of various designs. Use of a vibrator in a running automobile in connection with a varying battery potential brought problems other than those met in the above uses. The conditions could not be met by these prior devices or at best were met in an unsatisfactory manner. Plaintiff's device was intended to and did meet those problems in a manner which had been sought by the radio industry for some time.

Defendant, to show the development of the prior art, has submitted several informative charts, illustrating the series interrupting and the shunt circuit types of doorbells, converters, relays, and numerous types of contacts with stop controlled break and a number of devices showing a freely passing armature controlling contact make and break. These are designed to show that all of the elements of plaintiff's patent are found in the prior art and that the patent is invalid by reason of anticipation.

Despite the fact that all of these elements were known in the prior art, they had never been combined to function in the manner of plaintiff's device. The rule for guidance with respect to the effect of such devices in the patented claim is well defined: "A combination is a union of elements, which may be partly old and partly new, or wholly old or wholly new. But, whether new or old, the combination is a means—an invention—distinct from them." Leeds & Catlin Co. v. Victor Talking Machine Co., 213 U.S. 301, 29 S.Ct. 495, 500, 53 L.Ed. 805. While the elements are old, their manner of functioning in combination differ. Therein lies plaintiff's measure of patentability.

Many devices and patents have been introduced showing the development of the prior art in relation to vibrators. Most of these may be dismissed as not germane to the inquiry. Certain of these patents were examined in the Patent Office on the plaintiff's application. In view of the great importance of plaintiff's device it was incumbent upon the Patent Office to and it did make a very rigorous examination touching this application. The patents examined in the Patent Office and cited by the defendant were these: Parcelle Patent No. 345,720; Mendelson No. 846,227; Crawford & Stevenson No. 1,296,296; Nachod No. 1,688,-826; Grothe No. 1,846,101; Bassart No. 1,880,022. The Patent Office also considered other devices drawn from other arts including Farnham No. 527,839; Larsson No. 1,061,550; Burlingame No. 928,583; Dempster No. 1,019,608; Crenshaw No. 1,361,229; and Morse No. 1,477,889. Various of these patents may be found to be the equivalent of other patents or devices cited by the defendant. It is well known that validity is materially strengthened when the prior art was previously considered by the Patent Office. Elkon Works, Inc., v. Welworth Automotive Corp., D.C., 25 F.2d 968; Gulf Smokeless Coal Co. v. Sutton, Steele &

Steele, 4 Cir., 35 F.2d 433. Among the devices is a vibrator made by the Karadio Corporation. It consists of an electromagnet, a short spring bearing a longer armature so positioned that the center of the armature is opposite the pole face of the magnet, contact points mounted on the armature, one of them being designed to operate in conjunction with a fixed contact to open and close the circuit through the magnet, the others designed to alternately close separate circuits leading to the divisions of the winding in an associated transformer, the armature being tensioned away from the magnet and against the magnet circuit fixed contact and one of the transformer circuit fixed contacts. This device was used in connection with a "B" eliminator unit by the Police Department of Minneapolis. The magnet contact and one transformer circuit contact of this device, being normally closed, are subject to burning in case of reduction in voltage of the power supplied to the magnet. Since the magnet and its operating contacts are in series, there is not apt to be any burning of such contacts by reason of an increase in voltage but such increase may cause an irregular movement of the armature and result in burning of the transformer circuit contacts. Karadio structure thus lacks certain advantages of the patent device, the reed of which, being untensioned and controlled by normally open contacts, will not operate in case of a decrease of power, thus avoiding any burning of contacts but will swing freely with a regular movement in case of an increase in voltage, thus avoiding any chattering and consequent burning of contacts. The weight of the armature in relation to the tension of the spring in the Karadio device renders it much more subject to gravital stress than is plaintiff's armature.

Setchel testified that he designed the Karadio "B" battery eliminator unit beginning in June, 1931, commencing manufacture in the last part of July or early August. A sketch of the circuit, which was shown to an attorney on July 27, 1931, was offered in evidence. The earliest supporting documentary evidence is a bill dated October 1, 1931, for the spring used in the device and a stamping of a number of spring parts. Advertising of these units began in trade journals in May and June, 1932. Sale of this vibrator as a part of a car radio "NoBee" units is alleged to be proved by certain records from the files of the comptroller of the City of Milwaukee showing the purchase of "NoBee" units. There is supporting testimony to the effect that these units included the vibrators. A unit, including such a vibrator, withdrawn from police service was identified by Setchel as being in the same condition as when manufactured. Even the date of the Karadio advertising is prior to Barrett's filing date, January 3, 1933, the start of his sales on August 5, 1932, or the date of his part drawings, July 20, 1932. Barrett testified that his vibrator of the type patented was built in July, 1932, following up experiments commenced in 1931, which failed to produce a satisfactory vibrator. These experiments had to do with a resilient reed bearing an armature which reacted to an active magnet face mounted beyond it, and in another form with a resilient reed of sufficient length to extend beyond the active face of the magnet which was located about the center of the reed, an armature weight being attached at the end of said reed. In the intervening period, a hinged vibrator was developed by Barrett and placed upon the market. This device was unsatisfactory for reasons which need not be discussed here. The construction of the Karadio vibrator and the fact that it antedated the device such as illustrated by the patent drawings are adequately proved.

To read the claims of the patent upon the Karadio device would require a great deal of assumption as to mechanical equivalents since the plate upon which Karadio is mounted must be found substantially similar to the elongated casing of the patent. The resilient mounting of the contact points on the armature and the stationary mounting of the outer points must be assumed to be substantially similar to the end mounting of the resilient outer contacts and the limiting of their movement by means of spacing fingers. Even assuming all of the above equivalents, the device does not read under Claim 1, 9, 10, or 11, for it can not be found that the magnet is mounted with the pole face or faces facing the other end of the casing or that the armature is carried by the end of the center contact for swinging movement past, along or parallel with said pole face or faces.

On the basis of the above assumptions as to contact points, Claims 2, 3 and 7 read upon the Karadio device, except that the center contact is required to be untensioned by the patent whereas in Karadio it is tensioned. Claims 4, 5, and 6 read directly on

the Karadio device. Claim 8 does not read upon Karadio in that the latter device fails to have a normally untensioned center contact and does not have a shunt circuit to de-energize the magnet but has a normally tensioned common contact and the magnet circuit is of the series interrupted type. Claims 9, 10 and 11 call for normally open contacts and are not anticipated by Karadio with its normally closed contacts. Claims 1, 2, 3, 7, 8, 9, 10 and 11 are not anticipated by Karadio under the view most favorable to defendant. Claims 4, 5, and 6 are anticipated and invalid.

The Lomax vibrator made by the Automatic Electric Company, for telephone use, and disclosed as a unit of telephone system patents 1,665,708 and 1,750,934, has an even heavier armature, the weight of the armature itself being augmented by an adjustable weight mounted on a rod extending from the armature and will be affected to an even greater degree by road shock and gravity. Although having normally open contacts, it can not be adjusted permanently to avoid burned contacts regardless of battery voltage and position of installation. In fact, it is not practical to install this vibrator in other than a vertical position. Defendant claims for Lomax the attributes of a free swinging reed moving eccentrically past but never in contact with magnet pole piece. The main part of the armature is mounted parallel to the magnet, extending almost to the active pole piece of the magnet, which is recessed to allow passage of the rod bearing the armature weight. The contact points are mounted on resilient members extending from and beyond the main part of the armature. The part designated by defendant as the armature can not contact the pole piece of the magnet. As a practical matter the combination of armature and rod makes this a hammer type armature. The rod is not a separate part of the armature. It is subject to attraction toward the face of the magnet as is the heavier and larger part of the armature. Having normally open contacts, this device is not subject to damage by reason of such decrease in battery voltage as will result in failure to operate; nor are the contacts subject to burning in case of an increase of potential, because the resilient contact point mountings prevent such abrupt termination of the directional swing as would cause chattering or irregular vibration. It will thus be seen that the Lomax vibrator was an improvement over the Karadio device from the standpoint of danger of burning of contacts in case of low potential. However, advantageous use of either of these devices for automobile radios requires that they be installed with the reed in a vertical position. Neither of these devices has a free swinging armature, free from gravital influence in any position and burning and chattering in case of high battery potential, together with normally open contacts to protect contacts in case of low battery power.

Making the same assumption with respect to contact equivalents as previously made for the Karadio vibrator and reading the patent claims upon the Lomax device, it is found that Claims 4, 5 and 6 are anticipated by this device as well. In addition, by reason of the fact that the center contact is untensioned, the contacts normally open, and the electromagnet de-energized by a shunt circuit, Claims 2, 3, 7, and 8 are anticipated. Claim 1 is not anticipated, the Lomax vibrator not having a center contact for swinging movement past the pole face of the magnet. Claim 9 is not anticipated by Lomax, since it requires a reed mounted on the end opposite the magnet with an armature mounted for swinging movement in a plane substantially paralleling the plane of the magnet face, the free end of the reed being adjacent to the pole face. In view of the finding that the armature of Lomax includes the weight carrying rod, it can not be found that Lomax anticipates Claim 10, since the armature moves toward the pole face of the magnet rather than along such face. The same is true with respect to Claim 11 which calls for movement of the armature along the face of the pole piece of the magnet.

■ It is claimed by defendant that in Interference No. 69,476 in connection with Barrett's application No. 707,643 plaintiff admitted that Lomax Patent No. 1,750,-934 anticipated the device covered by the patent in suit. The interference involved one count reading as follows:

"In a device of the character described the combination with a transformer having one coil thereof connected intermediate of its ends with one side of a source of power, of a pair of contacts respectively connected to the opposite ends of said coil, a vibrating reed connected to the opposite side of said source of power normally out of

contact engagement with one of said contacts and adapted in its vibration to alternately engage said first-mentioned contacts, an electromagnet for vibrating said reed and means whereby said electromagnet will be short-circuited (i. e. 'shunted out') by the vibration of the reed in one direction."

The Interference count is very broad. So are Claims 2 through 8 of the patent in suit, which have been found anticipated by Lomax. Of the patent claims, Claim 8 corresponds most nearly to the Interference count. However, Claims 1, 9, 10 and 11 are more limited, the relation of the center contact and the magnet pole and the movement of the former past the latter being definite requirements. The plaintiff was not a party to the interference, and it is difficult to see how admissions, allegedly of record, can be attributed to it. At any rate the positions of the parties are the same, regardless of any consideration of the interference.

Other devices made by Automatic Electric Company, introduced as anticipations, are the Nelson device covered by Patent No. 1,451,886, the Peterson vibrator and the harmonic ringing vibrator. The Nelson vibrator was developed for use in automatic telephone exchanges. It had a resilient reed and was of the shunt type. However, such reed was drawn toward magnets mounted beside such reed. In this respect it is similar to the device with which Barrett experimented late in 1931, except that it had normally open contact points with a shunt circuit whereas Barrett was working on a device with normally closed contacts and a series interrupted circuit. Of similar general construction is the harmonic ringing vibrator. This latter device is distinguished also by bent fingers controlling contact movement. The Peterson vibrator consists of a magnet coil with a pole, a resilient reed mounted at one end of the coil and bearing an armature which opposes the active pole face, at the other end of the magnet. resilient side contacts are also mounted in a stack in conjunction with the resilient reed. Also mounted in the stack is a center contact oscillated by the action of the reed to alternately close circuits controlled by the outer contacts. A separate contact is provided which shunts out the magnet circuit after the closing of one transformer circuit. None of these de-

vices goes beyond the Karadio and Lomax devices as anticipations of Barrett.

Of the patents particularly relied upon by defendant, Parcelle, British Patent No. 5,533, was considered by the examiners in the Patent Office. This patent discloses a reed mounted on the opposite end of a base or frame from a plurality of magnets, bearing an armature which passes but does not touch the pole pieces of the magnets. It was designed for converting electrical energy into mechanical energy by means of a ratchet and pawl device interconnecting with the vibrating reed. Since a number of magnets are used to operate the vibrator, a normally closed contact arrangement is used for energization of the magnet which is first to energize and the movement of the reed operates to disengage the first contacts and to close a second set of contacts which energize another magnet for the purpose of extending the swing of the vibrator or reversing its direction. There is no thought of using a magnet operated vibrating reed to oscillate a common contact between fixed contacts in order to control circuits outside of the device itself.

The patent to Kraus, No. 1,671,245, shows a normally tensioned vibrating reed, a magnet mounted at the opposite end of the device, the free end of the reed being eccentric to the magnetic field of the magnet, a normally open common contact mounted on said reed, two fixed contacts mounted so as to complete separate circuits when the reed is vibrated. This device is intended as an alternating current rectifier. As such it is required to have a vibratory period equal to that of the current which is to be rectified. The normal period of vibration must be shortened to the period of the alternating current. To adjust the device to the particular period of vibration required, a fixed contact is provided, which interferes with the motion of the reed in one direction and shortens the normal period of vibration. No armature is provided and no circuit is provided to de-energize the magnet after it has drawn the reed in one direction. A change in voltage requires an adjustment of the Kraus device to avoid sparking. Such adjustment is impractical in the uses for which plaintiff's device was designed. In fact, the novelty of the patent lies in the avoidance of such sparking regardless of changes in the voltage of the source of power. Kraus can not be said to anticipate the patent device.

340

Many other patents have been introduced to show the state of the art. In these we find all of the elements of plaintiff's patent. The resilient reed bearing an armature is shown in Parcelle No. 345,720, Lomax No. 1,665,708 and 1,750,934. Movement of an armature past the pole faces of a magnet is illustrated in Parcelle, supra, Mendelson, 846,227, Kraus, supra, and German Patent No. 323,207. Resilient side contact mounting and resilient center contact mounting are shown in Bailey 308,731. Falkenchal 1,181,216, Kraus, supra, Lomax, supra, Lewis, 1,815,947, and German patent, 320,051. Normally open contacts with shunt circuit to de-energize the magnet are found in Lomax and the principle of a shunt circuit to de-energize a magnet is well known in the prior art. However, no one prior to Barrett combined these elements to form a device similar to that covered by claims 1, 9, 10 and 11 of the patent. The fact that all the elements are old does not preclude invention in the combination of such elements. Webster Loom Co. v. Higgins, 105 U.S. 580, 591, 26 L.Ed. 1177. Nor does the fact that the device seems of simple construction when completed.

Several patents which require special consideration in connection with the state of the prior art are: Keogh Nos. 1,935,568 and 1,935,569; Barrett patent No. 1,946,563 and Field No. 1,741,017. The Barrett patent in suit issued August 22, 1933, while the other Barrett Patent No. 1,946,563 issued February 13, 1934. Keogh patents issued November 14, 1933. The applications for both the Keogh patents and Barrett Patent No. 1,946-563 were filed prior to the filing date of application for the patent in suit. These patents were not pleaded to show that Barrett was not the inventor of the subject matter included in this suit but to show the state of the prior art. However, as to Barrett, nothing is disclosed affecting the present patent for no description or claim is made with regard to the circuit interrupter except to state that one, of the buzzer type, is included as a part of the combination. The drawing does not disclose any vibrator details which enlarge the prior art. The Keogh patents are altogether remote from the patent in suit. It is well settled that a later issued patent, even though maturing from an earlier filed application, can not be accepted as evidence of the state of the prior art and can be accepted only on the issue of prior invention. Stelos Co., Inc., v. Hosiery Motor-Mend Corp., 2 Cir., 72 F.2d 405;

Hazeltine Corp. et al. v. Electric Service Engineering Corp., D.C., 18 F.2d 662. The Keogh invention is of the closed circuit hammer type and subject to the disadvantages inherent in vibration so constructed. Field, supra, is alleged to constitute an anticipation as well as showing the state of the prior art. This discloses a type of vibrator in a "B" battery eliminator unit. The Field patent shows a hinge armature rather than a vibrating reed; normally closed contacts rather than normally open contacts; an armature moving directly toward the pole pieces; no yieldable support for the side contacts to allow the contacts to move relative to the armature after the contacts are closed. There is no protection against under-voltage or over-voltage. This device resembles the Rhumkorff interrupter of 1852. The armature of the Field device is actuated by magnetic flux emanating from the transformer rather than from a separate electromagnet. The idea of the patentee was to dispense with the electromagnet in order to lessen the cost of the vibrator but so doing renders it impossible to utilize normally open contacts as an under-voltage protection. Patent application of defendant's engineers No. S.N. 691,786 illustrates a transformer actuated buzzer arranged for use in a radio "B" battery eliminator unit. Subsequent in this same application we find description of defendant's vibrator, exhibit A, which shows the electromagnet.

The publications introduced by defendant relating to "B" battery eliminators are two pages from September, 1920, issue of Radio News and page from October, 1920, issue of Q. S. T. another advertisement; also page of questions and answers appearing in November, 1921, issue of Radio News. These are descriptions of the so-called De-Forest buzzer. It appears to have been a transformer actuated buzzer. From all that there is written, it appears that it had a rigid pivoted armature member, normally closed contacts with the armature moving directly toward the associated pole pieces on the transformer.

In a case such as this where the question of patentability is narrowly defined, certain factors deserve consideration. The fact that defendant has seen fit to use the device described by the patent is evidence that he sees merit therein. His failure to use the alleged anticipating devices strengthens the presumption that they are not as satisfactory as the patent device. Immediate acceptance by the public, evidenced by sale

and use and displacement of previous devices, further indicates that the device is a product of invention rather than mere skill. These points are indications of invention.

Defendant claims further that a device made by Howard H. Smith is a complete anticipation of the patent device, and that Barrett surreptitiously and unjustly sought and was granted a patent upon the device invented by Smith. Smith first visited the Utah plant in the latter part of June, 1932. In the early part of July he exhibited his device to Barrett and Dumke. This device had a resilient reed and resilient side contacts mounted in a stack at one end of the frame and a magnet mounted at the other end of the frame at right angles to the reed. A small armature was mounted on the end of the reed in such position that upon attraction by the magnet the armature would not strike the active pole piece, although the reed itself would strike said pole piece. As so constructed the device had an armature passing the pole face only in a manner similar to the Lomax device, previously described. It does not have the combination set forth in Claim 1 of pole pieces facing toward one end of the casing and contacts mounted at the other end extending toward said electromagnet, the center contact carrying an armature for swinging movement past the pole faces. It does not embody the characteristics of Claim 9 for the reason that the armature is not supported for swinging movement in a plane substantially paralleling the plane of the magnet mounted with said face in a transverse plane relative to the base. It does not read under Claims 10 and 11, since it does not have an armature supported for movement along but never in contact with the active pole face of the pole piece of a magnet.

There is no proof except the testimony of Benson to show a different device designed by Smith prior to his patent application filed October 10, 1932, in which the vibrator indicated conforms in all respects with the device of the Barrett patent in suit.

The Smith device as originally designed was an improvement over Barrett's devices of March, 1932, as exemplified by Exhibits 58 A, B and C, since it was a full wave vibrator and had normally open contact points. Considered as a step in the progress of the vibrator art it brings the art very close to the point where it remains only to apply a mechanic's skill to develop the vibrator of the patent. The change necessary to convert Smith's device into the Barrett device consists merely in lengthening the casing and turning the magnet from a position transverse of the casing to a position above and in line with the reed.

It is unnecessary to make such a finding however, inasmuch as Barrett actually found the combination of the patent in 1931, when he designed the device of which Exhibit 53 is a replica. Claims 10 and 11 of the patent read directly upon the device, while Claim 9 differs only in that the magnet is required to be mounted at one end of the casing. The device does not include the resilient side contacts of Claim 1. The location of the active pole face at the end of the casing in Exhibit 53 is mechanically equivalent to an end mounting of the magnet. The principle of the patent is disclosed in the device although it was not satisfactory from an operating standpoint, because Barrett did not have the proper material for the reed. Dumke, plaintiff's plant superintendent in charge of production and tooling up for new products, and Bertschi, a model maker and experimental man, corroborate the development of the device exemplified by Exhibit 53 and the experiments performed with it.

In the light of this finding, the failure of both parties to call Smith loses significance. The calling of Smith by either party would have relieved the case of some confusion. The failure to call re-acts most unfavorably against the defendant, since it attempted to show by the testimony of Benson alone that Smith had a device like that of the patent in early July, 1932. Neither of Benson's drawings, Exhibit 202, illustrating his recollection of the forms which might have been taken by the sample device submitted, correspond with Exhibit 61, but do correspond with plaintiff's patent drawing and his manufactured device exemplified by plaintiff's Exhibit D accompanying the plaintiff's bill of particulars and the commercial device as modified and exemplified by plaintiff's Exhibit F accompanying the plaintiff's bill of particulars. It is reasonable to assume that Benson's recollection of the device after a lapse of five years was colored by his subsequent contacts with the patent and with plaintiff's and defendant's various structures. The fact that Smith had an idea and a device are adequately proved. That plaintiff was interested in and entered into a contract to produce and pay royalties upon the device and did pay royalties upon all vibrators produced for a considerable time is adequately proved. However, the device submitted by Smith was not proved to be the device covered by the patent in suit.

342

The plaintiff was under no duty to call Smith to refute a defense not adequately proved, and its failure to call him can not be presumed to have been based upon the fact that Smith would have testified unfavorably to plaintiff.

It must be found that Claims 1, 9, 10 and 11 are valid and infringed, and that Claims 2 to 8, inclusive, are anticipated and invalid.

Plaintiff asks for punitive damages under the authority of Section 70, Title 35 U.S.C., 35 U.S.C.A. § 70, upon the ground that infringement was wilful and wanton. It is the defendant's contention that any question in this connection should not be considered at this stage of the litigation. This court agrees with this contention. It should be determined by the court following a hearing before the Master on an accounting for profits and damages. This seems to be the practice followed in numerous cases. Pyle National Co. v. Lewin, 7 Cir., 92 F.2d 628; Overman Cushion Tire Co. v. Goodyear Tire & Rubber Co., 2 Cir., 66 F.2d 361, second case; Parker Rust Proof Co. v. Ford Motor Co., D.C., 23 F.2d 502; Wallace & Tiernan Co. v. City of Syracuse, 2 Cir., 45 F.2d 693; New England Fibre Blanket Co. v. Portland Telegram et al., 9 Cir., 61 F.2d 648, affirming, D.C., 34 F.2d 446, certiorari denied 289 U.S. 752, 53 S.Ct. 696, 77 L.Ed. 1497; Weston Electrical Instrument Co. v. Empire Electrical Instrument Co., C.C., 155 F. 301; Miner v. T. H. Symington Co., 2 Cir., 247 F. 515, second case; Auto Vacuum Freezer Co. v. William A. Sexton Co., D.C., 250 F. 459, 467. No decision is therefore now made upon the claim for punitive damages.

A decree for an injunction and an accounting may be entered in accordance with foregoing opinion, with costs to the plaintiff.